**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

| | |
|---|---|
| KLLM, INC. AND KLLM<br>TRANSPORT SERVICES, INC. | PLAINTIFFS/COUNTER-DEFENDANTS |
| VS. | CIVIL ACTION NO.: 3:08cv12-DPJ-JCS |
| WATSON PHARMA, INC. AND<br>FACTORY MUTUAL INSURANCE CO. | DEFENDANTS/COUNTER-PLAINTIFFS |

**ORDER**

This commercial contract action is before the Court on cross-motions for partial summary judgment filed by Defendants/Counter-Plaintiffs Watson Pharma, Inc.("Watson") and Factory Mutual Insurance Company ("FM") [85] and Plaintiffs/Counter-Defendants KLLM, Inc. and KLLM Transport Services, Inc. (collectively "KLLM") [88]. The Court, having fully considered the parties' submissions and the pertinent authorities, finds that KLLM's motion should be granted, and the motion of Watson and FM should be denied.

**I.     Facts and Procedural History**

Watson is a manufacturer and distributor of pharmaceutical products. KLLM is an interstate motor carrier. Their dispute in this suit began when two KLLM drivers left a tractor-trailer loaded with Watson's products unattended at a truck stop in Troy, Illinois. When the drivers returned, the truck was gone. In general terms, the pending motions turn on whether the parties contractually agreed to limit liability for Watson's lost cargo.

Under the original arrangement between the parties, Watson would request, via email, price quotes from KLLM for specified routes. Upon receiving KLLM's response, Watson would either accept or reject the offer. If Watson accepted the rate for a particular route, KLLM would

"publish" the rate in a document it called an "appendix," and that rate would be the set price for that route. The parties did not, however, have a formal agreement and instead operated on an ad hoc basis.

In late 2005 and early 2006, each party sought to move the business relationship into a contractual setting, and Watson, an experienced shipper, eventually sent KLLM its standard form transportation agreement for review. Significantly, Watson's proposed agreement did not include any limit to KLLM's liability, and KLLM contested the omission in writing. According to the unrebutted testimony of KLLM's corporate representative Chris Wood, KLLM had assumed when quoting the historical rates that liability would be limited to $100,000 but that higher limits were available for higher rates. Wood Depo. at 62. Watson's corporate representative Steve Shaw testified that during this period, "we were working off basically their [KLLM's] standard terms and conditions and the pricing agreements that we had in place." Shaw Depo. at 138. Because Watson's proposed transportation agreement contained no liability limit, KLLM requested addition of the following language: "Carrier's maximum cargo liability shall be limited to $100,000 per occurrence." The parties failed to reach an agreement as to the contract Watson drafted.

In January and February 2007, still without a formal contract, the parties renegotiated the route rates published on the appendix. As part of this renegotiation, the parties adopted a new rate schedule for the route upon which the KLLM drivers lost Watson's cargo. The appendix included round trip and one way rates to and from Corona, California, where the subject shipment originated. In addition, the schedule contained a note reading: "Note 2. Carrier's maximum cargo liability is limited to $250,000 per occurrence." Watson signed off on this schedule.

On February 28, 2007, the parties finally executed a formal transportation agreement ("Transportation Agreement" or "the Agreement"). Compensation was addressed in Paragraph IV of the Agreement, which stated in relevant part: "As compensation for services rendered, Shipper [Watson] shall pay Carrier [KLLM] pursuant to the schedule of rates or charges set forth herein as Appendix B. These rates may be modified by written addendum signed by both parties and attached hereto." The original version of Appendix B reflected the same rates the parties had been operating under prior to the Transportation Agreement. As such, the previous rates became part of the newly-minted agreement.

The Agreement also contained two paragraphs which are the subject of the parties' motions. Paragraph VII(A) states in relevant part:

> Liability for cargo claim. Carrier accepts liability for loss, damage, or delay of cargo to the extent set forth in federal statute (49 U.S.C. § 14706). Carrier will pay the full actual value of shipments lost, damaged or delayed in transit for which it is liable *subject to the limits of any applicable released evaluation.*

(Emphasis added).

Paragraph IX reads:

> Released Evaluation. Unless otherwise agreed in writing, all rates are based upon standard pricing which is predicated on a maximum released evaluation of $2.50 per pound per article or $100,000 per truckload whichever is less. Rates applicable for shipments with higher full value liability amounts are available on a specified shipment basis.

Watson's corporate representative, Steve Shaw, and its corporate counsel reviewed and signed off on the Transportation Agreement.

Just over a week after executing the Transportation Agreement, on March 8, 2007, the parties re-negotiated the rate for round trip and one way routes involving Watson's Corona, California, facility. The renegotiated rate schedule was signed by the parties and attached to

Appendix B. This second schedule was identical to the pre-Transportation Agreement schedule in every respect except two: First, although the stops and mileage were the same, the notation on this new schedule read: "Note 2. Carrier's maximum cargo liability is limited to $100,000 per occurrence" (*i.e.*, $150,000 lower than the previous agreement). There is no indication from the appendix that Note 2 was limited to the round trip or one way Corona routes, and Shaw testified that the liability limitation "was negotiated between KLLM and Watson . . ." Shaw Depo. at 136. Second, the rate quoted for the subject route was $1000 less than the previous rate agreed to in the pre-Agreement rate schedule.

On June 17, 2007, an entire truck containing Watson's shipment was stolen. KLLM filed suit on January 4, 2008, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 regarding its liability to Watson for the stolen goods. Watson answered on January 28, 2008, and counterclaimed against KLLM for the losses it sustained as a result of the stolen shipment. FM, seeking to enforce its subrogation rights as Watson's insurer, moved to intervene as a Plaintiff on February 5, 2008. FM's motion was granted and FM joined on March 7, 2008.

Following several months of discovery, the parties cross-moved for partial summary judgment. The question now before the Court is whether the Transportation Agreement effectively limits KLLM's liability for the stolen shipment. Both parties agree that the question is governed by the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706.

## II.     Summary Judgment Standard

Summary judgment is warranted under Rule 56(c) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying

those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must then go beyond the pleadings and "identify specific evidence in the record and ... articulate the precise manner in which that evidence supports his or her claim." *Fuentes v. Postmaster Gen. of U. S. Postal Serv.*, 282 F. App'x 296, 300 (5th Cir. 2008) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F .3d 754, 759 (5th Cir. 2002)*; SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1997); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

**III.     Analysis**

    A.     Limitation of Liability

The Carmack Amendment was passed in 1906 to create a national regulatory framework for establishing interstate carrier liability for property loss. *N.Y., N.H. & Hartford R. Co. v. Nothnagle*, 346 U.S. 128, 131 (1953). In general, it provides that carriers are liable for the full value of cargo lost. *Id*. In 1916, Congress modified the Carmack Amendment to add an exception to this general rule. *Id*. at 132. In its present form, this exception states that a carrier

> may . . . establish rates for the transportation of property . . . under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.

49 U.S.C. § 14706(c)(1)(A).

Whether a carrier fits this exception to the Carmack Amendment and thus effectively limits its liability for cargo loss is determined under the four part test announced in *Hughes v.*

*United Van Lines, Inc.*, 829 F.2d 1407 (7th Cir. 1987), *cert. denied,* 485 U.S. 913 (1988). Under the *Hughes* test,

> [a] carrier may limit its liability if the carrier: (1) maintains a tariff within the prescribed guidelines of the Interstate Commerce Commission (now the Surface Transportation Board); (2) obtains the shipper's agreement as to her choice of liability; (3) gives the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issues a receipt or bill of lading prior to moving the shipment.

*Hoskins v. Bekins Van Lines*, 343 F.3d 769, 778 (5th Cir. 2003) (citing *Rohner Gehrig Co. v. Tri-State Motor Transit*, 950 F.2d 1079, 1081 (5th Cir. 1992) (en banc)).[1] The parties agree that KLLM satisfies the first and fourth prongs, leaving the second and third for consideration.

### 1. The Shipper's Choice of Liability

There is no dispute that the parties negotiated and signed the Transportation Agreement, but to satisfy the second prong of the *Hughes* test, the contract must actually limit liability. *See Hoskins,* 343 F.3d at 779 (holding that second prong was satisfied where shipper signed contract that limited liability).[2] To determine whether it does, the Court must interpret the contract.

It is a basic "canon of contractual interpretation that . . . words and phrases in a contract [are] to be given their plain meanings, unless the document demonstrates that the parties intended for the terms to be employed in some special or technical sense." *Cleere Drilling Co. v.*

---

[1]The ICC Termination Act of 1995 (49 U.S.C. § 702) decommissioned the Interstate Commerce Commission, replacing it with the Surface Transportation Board. Under current law, carriers of non-consumer goods are no longer required to file tariffs with the STB. *Gulf Rice Ark. v. Union Pac. R.R. Co.*, 376 F. Supp. 2d 715, 721 (S.D. Tex. 2005) (citing *Fireman's Fund McGee v. Landstar Ranger, Inc.*, 250 F. Supp. 2d 684, 688 n.4 (S.D. Tex. 2003)).

[2]The Court echoes the observation that "the choice of liability is inextricably intertwined with a reasonable opportunity to choose." *Rohner*, 950 F.2d at 1083. Accordingly, overlap exists between the second and third prongs of the *Hughes* test. For organizational purposes, the Court will address Watson's contract construction arguments under the second prong and save the "opportunity to choose" analysis for the third prong. *See Section III(A)(2) infra*.

*Dominion Exploration & Prod., Inc.*, 351 F.3d 642 (5th Cir. 2003). Moreover, "a contract should be interpreted so as to give meaning to all of its terms-presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous." *Mannesman Demag Corp. v. M/V CONCERT EXPRESS*, 225 F.3d 587, 594 (5th Cir. 2000) (citation omitted). Finally, it is a "long standing and generally accepted principle of contract law that, absent fraud or mental incompetence, a person who intentionally signs a document is bound by its contents," even when he or she did not read the document. *Donovan v. Mercer*, 747 F.2d 304 n.4 (5th Cir. 1984).

Watson argues that no "applicable" released evaluation existed "for the stolen shipment because the rates were not calculated pursuant to the 'standard pricing' that forms the basis of the released evaluation program. Instead, the rates used by the parties pre-existed the contract, and were calculated without consideration of any liability limitation." Watson's Memorandum in Support of Summary Judgment [86] at 7.

To understand Watson's position, it is first necessary to understand the term "released evaluation." As indicated in the language of the Carmack Amendment itself, carriers are liable for the actual value of the goods they transport, unless the shipper and carrier agree to a lower value for the cargo when it is released to the carrier. *See* 49 U.S.C. § 14706(c)(1)(A). Although typically referred to as a "release value" or "release valuation," this form of limiting liability has existed since the 1800's. *See e.g., Hart v. Penn. R.R.*, 112 U.S. 331 (1884).

As Watson notes, Paragraph VII(A) of the Agreement states that KLLM accepts liability for the full value of the loss, unless there exists an "*applicable* released evaluation." (Emphasis added). However, Paragraph IX unambiguously provides a released evaluation, stating that "[u]nless otherwise agreed in writing, *all rates* are based upon standard pricing which is

predicated on a maximum released evaluation of $2.50 per pound per article or $100,000 per truckload whichever is less." (Emphasis added). As Paragraph IV of the contract provides the only mechanism for "pricing," it necessarily reflects "standard pricing." Thus, reading the plain terms of Paragraphs IV, VII(B) and IX, giving each its plain meaning, the parties intended that "all rates" set pursuant to Paragraph IV would be "predicated" on the stated release value.

Watson nevertheless contends that the subject rate was not "standard" because it was established before the Transportation Agreement. First, all of the original rates were negotiated before the Transportation Agreement and were, by the terms of Paragraphs IV, VII (A) and IX, "predicated" upon the release evaluation. Any other interpretation would nullify Paragraph IX as to all rates reflected in the original Transportation Agreement, and there is no language in this contract suggesting an intent to laser out previously negotiated rates. Such a provision could have been easily adopted.[3]

More significantly though, the pre-Agreement rates are irrelevant because the parties renegotiated the subject rate after the Transportation Agreement was signed but before the loss occurred. The modified price was signed by representatives for Watson and KLLM and was attached to the Transportation Agreement. This is exactly what Paragraph IV permits when it states that "rates may be modified by written addendum signed by both parties and attached hereto." The parties followed the standard pricing mechanism that Paragraph IV provides, which triggers the release evaluation of Paragraph IX. Whatever other factors may have been used in

---

[3]In addition to the contract language that the release evaluation predicated "all rates," KLLM's corporate representative Chris Wood testified that KLLM calculated the original prices with the assumption that liability was limited. Wood Depo. at 62-63, 66. Watson admitted that the pre-Agreement rates were adopted based on KLLM's standard terms and conditions. Shaw Depo. at 138. Although Watson points to Wood's testimony in which he failed to list liability limits among the various pricing factors, elsewhere in his testimony, Wood explained that the liability limit was a factor. Wood Depo. at 62-63, 66.

arriving at the new, lower rate, Paragraph IX expressly states that the release evaluation forms a predicate for the price "unless otherwise agreed in writing." Watson has produced no written agreement that the renegotiated pricing would be exempt from the released evaluation. As such, the new price was "predicated" on the release evaluation, and the Transportation Agreement therefore limited liability.

To summarize, the Court finds as a matter of law that a valid contract existed between the parties and that the contract contained a released evaluation provision that applied to the shipment in question. Therefore, the second prong of the *Hughes* test will be met if Watson received a reasonable opportunity to choose the level of liability. *Hoskins,* 343 F.3d at 779.

2.  *Shipper's Reasonable Opportunity to Choose Levels of Liability*

The third prong of the *Hughes* test requires that the carrier give the shipper a reasonable choice between two or more rates which are based on higher or lower levels of carrier liability. *Hoskins*, 343 F.3d at 778. According to Watson, KLLM fails this prong because the pre-Agreement rates were originally negotiated without a liability limitation, and KLLM essentially adopted the original rates into the Agreement, attempting to then impose a liability limitation without affording Watson the corresponding rate reduction. As before, this argument ignores the fact that Watson and KLLM renegotiated the rate for the subject route before the loss occurred. When the applicable rate is reviewed in light of the legal standards and the contract language, no reasonable juror could find that KLLM failed to satisfy this prong.

According to the Fifth Circuit, a carrier discharges its duty under the third prong of the *Hughes* test if it provides the shipper with "reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice." *Hoskins*, 343 F.3d at 779; *Hughes*, 829 F.2d at 1419. This statement is consistent with the

Supreme Court's statement in *Nothnagle* that "only by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained." *Nothnagle*, 346 U.S. at 135 (citations omitted). The Court will first consider the notice issue and then address opportunity.

As to notice, the Agreement clearly enunciated the released value that formed the "predicate" of rate calculations under the Agreement. Watson's corporate representative, Steve Shaw, testified that he and Watson's senior counsel both reviewed the Agreement before it was signed. Shaw Depo. at 55, 68. Even if they had not, Watson signed the Agreement and would be deemed as having notice of its terms. *Gulf Rice Ark.*, 376 F. Supp. 2d at 722 (citing *Fireman's Fund McGee*, 250 F. Supp. 2d at 689 ("[w]hen a carrier's limiting terms are incorporated into the governing contract between the parties, the shipper is deemed to have constructive knowledge of the terms."). Thus, when the rates were renegotiated in March 2007, both parties knew that the released evaluation existed and was a predicate to the rate calculation unless otherwise stated in writing. Again, there is no writing that reflects an agreement to exclude the new rate from the released evaluation–it was therefore included. Watson cannot credibly claim that it was unaware of the unambiguous terms of the Transportation Agreement.

KLLM also afforded Watson the opportunity to obtain the necessary information to make an informed choice as to liability. First, the parties negotiated the Agreement over an extended period of time, and there is no dispute that KLLM made a written request that the final contract contain a limit of liability (something KLLM believed was already reflected in the pre-Agreement rates). The final version contained such a limitation.

Second, Watson's representative testified that during the negotiations that resulted in the March 2007 amendment to the Corona, California, rate schedule, he had discussed lowering the liability limits. Shaw Depo. at 81. As mentioned *supra*, the renegotiated rate was lower and included a note that stated, "Carrier's maximum cargo liability is limited to $100,000 per occurrence." This limit was $150,000 less than the limit reflected in the rate originally attached to the Agreement, and Watson admits that the limit was negotiated. Shaw Depo. at 136. The parties do not seem to suggest that this provision is a valid limitation under the exception to the Carmack Amendment, but it does reflect that other limits were discussed and available.

Third, and most obviously, the Agreement itself provides in Paragraph IX that "[r]ates applicable for shipments *with higher full value liability amounts are available* on a specified shipment basis." (Emphasis added).[4] Thus, less than two weeks before the parties renegotiated the subject rate, they signed an agreement that expressly informed Watson that KLLM was not exposed to full value liability but that full Carmack protection was available at higher rates. Watson was given "the opportunity to obtain information necessary to making a deliberate and well-informed choice." *Hoskins*, 343 F.3d at 779; *Cf., Siren, Inc. v. Estes Express Lines*, 249 F.3d 1268, 1271 (11th Cir. 2001) (noting that "the statute requires nothing more than a valid written contract between the parties establishing a reasonable value for the purpose of limiting the liability of the carrier.").[5] Watson was afforded a reasonable choice as to the level of liability

---

[4]Carriers like KLLM are no longer required to actually file tariffs with the ICC. See n.2 *supra*. Instead, upon request of the shipper, the carrier is required to provide "a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based." 49 U.S.C. § 14706(c)(1)(B).

[5]According to KLLM's testimony, its website also contained a rules circular that provided this same information. While Watson was aware, even before the Agreement, that KLLM had a rules circular, Shaw Depo. at 143, there is a question whether KLLM properly authenticated this

it desired. *See, e.g., Gulf Rice Ark.*, 376 F. Supp. 2d at 722 (holding shipper had reasonable notice of liability limitation where carrier's waybill referenced form which referenced carrier's circular which contained the provisions).

In reaching this conclusion, the Court has considered but distinguishes or otherwise rejects the non-binding authority Watson cites in its memoranda of law. As noted in *Hollingsworth & Vose Co. v. A-P-A Transportation Corp.*, "circuit courts have not been able to agree on any single, bright-line test for what is a 'fair opportunity.' Partly this results from the diversity of fact-patterns . . ." 158 F.3d 617, 619-20 (1st Cir. 1998). The cases Watson cites arise from distinguishable fact patterns, most of which did not involve a clear agreement to limit liability reflected in a well-negotiated transportation agreement signed by a sophisticated shipper with full knowledge that higher liability limits were available for higher rates.[6] Finally, reliance on limitations of the global Transportation Agreement is especially appropriate when, as in this case, the shipper does not disclose the content of the individual shipments for security reasons.

Because Watson was given both reasonable notice of the liability limitation and a reasonable opportunity to elect a different level of liability, the released evaluation provisions contained in the Agreement satisfy the third prong of the *Hughes* test, and the Court finds that KLLM effectively limited its liability.

B.     Material Deviation Doctrine

Watson contends that it had a security agreement with KLLM under which KLLM agreed that trucks on the Corona, California, route would never be left unattended. Because the drivers

---

document in its submissions.

[6]Even if not sophisticated, the knowledge and opportunity were still apparent. *See Rohner*, 950 F.2d at 1084-85 (holding that sophistication is not relevant in single transaction context but that it could be relevant in other contexts).

of the stolen truck left it unattended during the time in which it was stolen, Watson claims that KLLM materially deviated from the contract to such an extent that it cannot now claim the benefit of the liability limitation.

Under the Carriage of Goods by Sea Act, 46 U.S.C. § 30701, an ocean carrier's liability for lost or damaged cargo can be limited. "A carrier loses this protection, however, if a deviation from the specifications contained in its contract of carriage with the shipper amounts to more than a reasonable deviation." *Constructores Tecnicos, S. de R.L. v. Sea-Land Serv., Inc.*, 945 F.2d 841, 844 -845 (5th Cir. 1991) (citing 46 U.S.C. § 1304(4), now 46 U.S.C. §30701). This so-called material deviation doctrine, has been long recognized in admiralty law and is codified in § 30701 Sec. 4(4). Obviously, KLLM is not an ocean carrier, and the Carmack Amendment contains no provision similar to § 30701 Sec. 4(4). Still, some courts have applied the material deviation doctrine beyond the confines of admiralty law, and Watson now encourages this Court to follow suit.

Whether the material deviation doctrine has application to overland transportation contracts governed by the Carmack Amendment is far from settled. Watson correctly notes that a few courts have adopted the doctrine in the motor carrier context. *See, e.g., NipponKoa Ins. Co. v. Watkins Motor Lines, Inc.*, 431 F. Supp. 2d 411, 418 (S.D.N.Y. 2006); *Praxair Inc. v. Mayflower Transit, Inc.*, 919 F. Supp. 650, 656 (S.D.N.Y. 1996); *The Limited, Inc. v. PDQ Transit, Inc.*, 160 F. Supp. 2d 842, 845 (S.D. Ohio 2001). However, this expansion of the law has not gained significant traction.

A majority of jurisdictions, including the Fifth Circuit, have not addressed the issue. Those that have, generally hold that the material deviation doctrine does not apply to Carmack Amendment cases. *See, e.g., Rocky Ford Moving Vans, Inc. v. United States*, 501 F.2d 1369,

1372 (8th Cir. 1974) ("[A]dmiralty law doctrine has no application in the context of regulated interstate commerce, which is governed by the overriding federal policy of uniformity."); *Kan. City Fire & Marine Ins. Co. v. Consol. Rail Corp.*, 80 F. Supp. 2d 447, 451 (E.D. Pa. 1999) (opining that material deviation doctrine has not been extended beyond admiralty context); *Conoco, Inc. v. Andrews Van Lines, Inc.*, 526 F. Supp. 720, 722 (W. D. Okla. 1981) (adopting *Rocky Ford Moving Vans*, 501 F.2d 1369). Closer to home, the United States District Court for the Southern District of Texas declined to adopt the theory in *Toppan Photomasks, Inc. v. North American Van Lines, Inc.*, No. H-05-3201, 2007 WL 173904, at *3 (S.D. Tex. Jan. 19, 2007). No other court within this circuit has considered the issue.

Although the material deviation doctrine in admiralty law and the released value doctrine in motor carrier law have coexisted for nearly 100 years, it is only recently that a handful of courts has decided to merge the two. Significantly, Congress has statutorily regulated both admiralty and motor carrier law, and it has never seen fit to adopt a material deviation doctrine in the later context.

Finally, there are policy reasons to avoid adopting the doctrine in the context of a Carmack Amendment case. As stated in *Rocky Ford Moving Vans, Inc.*, "[a]dmiralty law doctrine has no application in the context of regulated interstate commerce, which is governed by the overriding federal policy of uniformity." 501 F.2d at 1372. In *American Cyanamid Co. v. New Penn Motor Express, Inc.*, the court held that if applied at all, the material deviation doctrine would be limited to "nothing short of intentional destruction or conduct in the nature of theft of the property" (which does not apply in the present case). 979 F.2d 310, 315-16 (3rd Cir. 1992). The court noted that such uniformity is desirable as "a shipper can protect itself from loss by paying for a higher level of protection." *Id.* at 316. The court also noted that allowing claims

based on lower levels of fault would encourage litigation. *Id*. ("We think it better that there be certainty in these commercial settings, particularly since the shipper can protect itself by paying for a higher level of protection.").

In the present case, there is nothing in the contract to suggest that the security provision trumps the liability limit, and unlike admiralty where the material deviation doctrine has long been recognized and is reflected in the United States Code, the parties to this contract would have had no reason to anticipate that the law would imply such an intent. Under these circumstances, and absent binding authority, the Court declines the invitation to expand the law.

## IV. Conclusion

The Transportation Agreement is both clear and unambiguous. The rates for the route at issue were negotiated pursuant to that contract, and Watson cannot now claim that it is not subject to these provisions freely negotiated by two sophisticated parties.

For the foregoing reasons, it is hereby ORDERED that Defendants/Counter-Plaintiffs Watson Pharma, Inc. and Factory Mutual Insurance Company's Motion for Partial Summary Judgment is DENIED, and the Motion of Plaintiffs/Counter-Defendants KLLM, Inc. and KLLM Transport Services, Inc. for Partial Summary Judgment is GRANTED.

It is further ordered that the stay of this matter is lifted and that the parties contact Magistrate Judge James Sumner to reset the scheduling order.

**SO ORDERED AND ADJUDGED** this the 17th day of June, 2009.

                                                 s/ *Daniel P. Jordan III*
                                                 UNITED STATES DISTRICT JUDGE